The order of the district court will be affirmed.

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Nick SCAGLIONE, Defendant-Appellant.**

**No. 29279.**

United States Court of Appeals,
Fifth Circuit.

July 9, 1971.

Henry Gonzalez, Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Bernard H. Dempsey, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

Scaglione appeals from his conviction by a jury on all five counts of an indictment charging that, on each of five dates, he knowingly and intentionally caused to be sent in interstate commerce gambling paraphernalia consisting of flash paper intended to be used as a device in a numbers, policy, bolita, and other similar games, in violation of 18 U.S.C. § 1953. Flash paper, having been chemically treated so as to be instantly combustible when heat is applied, is used in policy and similar games because it can be quickly destroyed if there is a threat of seizure. We affirm.

1.

■ The trial court did not err in denying defense demands for production under the Jencks Act, 18 U.S.C. § 3500, of two interview reports of FBI agents who had interviewed government witness Candeleiri. Candeleiri was examined fully on voir dire. He testified that he signed no statement, that he did not observe the agents taking notes in their interviews with him, and that he saw no notes. The trial judge examined the agents' interview reports and ascertained that they were not signed by Candeleiri. All concerned recognized that the reports were not producible unless, under § 3500(e) (1), they had been "otherwise adopted or approved" by Candeleiri.

Two or three days before trial the prosecutor met with Candeleiri in the presence of the agents who had interviewed him. As the prosecutor described it, he asked Candeleiri to "give the facts of the case as you remember them," Candeleiri did so, and at some points where Candeleiri's recital differed from what was shown by the report the prosecutor would interrogate him further about the particular aspect. The prosecutor stated also "we simply reviewed the substance" of the reports.

Candeleiri's description was that the prosecutor held the statement[s] in his

hand and from time to time read to him and asked him "What about it?" and would ask "Do you recall the statement?" The trial court asked Candeleiri:

Q. Do you know whether he was asking you what was in the statement or not?

to which Candeleiri responded:

A. Well, he looked at it and asked me, so I imagine he did, Judge.

The government relies upon Matthews v. United States, 407 F.2d 1371 (5th Cir. 1969) which held that an agent's reading portions of his notes to the person interviewed and asking him to verify the accuracy thereof, which the person did, was not an adoption of the agent's notes in their entirety. We pointed out, 407 F.2d at 1376, that there was no verbatim or even substantially verbatim repetition of the notes by the agent to the witness or a confirmation by the witness of their completeness. However, *Matthews* is not a free ticket to circumvention of the Jencks Act. We do not exclude the possibility that the witness may adopt or ratify an interview report in a piecemeal manner by response to a number of inquiries as effectually as by a single generalized response. The inquiry is whether the witness has made as his own "the product of the investigator's selections, interpretations and interpolations," Palermo v. United States, 360 U.S. 343 at 350, 79 S.Ct. 1217, at 1223, 3 L.Ed.2d 1287 at 1294 (1959), so that the defense should be permitted to use it to impeach him. If the witness has not done so it is grossly unfair to use the language, interpretations and interpolations of someone else to impeach him. *Id.* Our review of the trial judge's ruling that Candeleiri did not adopt the interview reports is to determine whether it was plainly erroneous. *Matthews, supra,* 407 F.2d at 1376. We are not able to say that it was.

Alternatively, appellant urges that a witness' testimony from the stand which is consistent with a statement not signed and not otherwise adopted or ratified is itself a ratification or adoption. This is a fundamental contradiction. The Jencks Act·is directed to making the witness' statement available so that contents which are inconsistent with his in-court testimony may be used for impeachment. If the testimony is so consistent with the statement as to be an adoption or ratification thereof it can serve no purpose as impeaching.

Appellant also claims to have been erroneously denied Jencks Act production of statements of witnesses Fried and Elz. There was no evidence of their ratifying or adopting their statements, and the defense did not even demand the statement of Elz.

2.

On April 24, 1965 Internal Revenue Service agents raided an apartment which did not belong to appellant, pursuant to a search warrant predicated on the federal wagering tax statutes. The affidavit for the·warrant alleged violations of Sections 4411, 4412, 4901 and 7203 of the Internal Revenue Code of 1954.[1] Scaglione was found in a room of the apartment with a large quantity of assorted gambling paraphernalia. The paraphernalia was seized, Scaglione was arrested and other paraphernalia taken from his person. He was charged with failing to register and pay the special occupational tax required of persons in the business of accepting wagers, in violation of Sections 4411, 4412, 4901(a) and 7203. Scaglione filed a motion to suppress, it was denied, and he was tried and convicted. This court reversed, Scaglione v. United States, 396 F.2d 219 (5th Cir. 1968), on the authority of Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

In the present case, some of the paraphernalia seized in the search of April 24, 1965 was introduced, over objection,

---

1.  26 U.S.C. §§ 4411, 4412, 4901 and 7203.

as circumstantial evidence of Scaglione's guilt of the charge of interstate transportation of gambling paraphernalia. Thus we are squarely presented with the question whether *Marchetti* and its companion case, Grosso v. U. S., 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), apply retroactively to bar the introduction, in a collateral prosecution under § 1952, of evidence seized during a pre-*Marchetti-Grosso* search pursuant to a warrant issued on the basis of probable cause to believe there existed a violation of the statutory scheme invalidated in *Marchetti* and *Grosso*. Because of our disposition of this question, it is unnecessary for us to pass on the government's contention that Scaglione may not now raise this issue because he failed to raise it in his earlier appeal.

The Supreme Court has not answered the precise question before us, but it is one of the issues presented in Washington v. United States, 402 F.2d 3 (4th Cir. 1968), cert. denied, 402 U.S. 978, 91 S.Ct. 1641, 29 L.Ed.2d 145. United States v. United States Coin & Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), involved pre-*Marchetti-Grosso* forfeiture proceedings brought against one who had been previously convicted of violating the gambling tax and registration statutes by failing to submit the required forms and pay the tax. The Court held that *Marchetti* and *Grosso* should be applied retroactively to require reversal of the forfeiture since the appellant "had the Fifth Amendment right to remain silent in the face of the statute's command that [he] submit reports which could incriminate [him]. In the absence of a waiver of that right, [he] could not be properly prosecuted at all." 401 U.S. at 723, 91 S.Ct. at 1046, 28 L.Ed.2d at 440. *See also,* United States v. Lucia, 416 F.2d 920 (5th Cir. 1969), aff'd en banc, 423 F.2d 697 (1970), cert. denied, 402 U.S. 943, 91 S. Ct. 1607, 29 L.Ed.2d 111 (1971).

However, Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971), decided the same day as *U.S. Coin & Currency,* leaves unresolved the question whether *Marchetti* and *Grosso* should be applied retroactively in all contexts. *Mackey* upheld the use of submitted wagering excise tax returns in a pre-*Marchetti-Grosso* prosecution for income tax evasion. Four members of the Court[2] analogized the returns, submitted pursuant to the subsequently reviewed statutory scheme, to evidence seized in a search conducted by means which, while valid at the time of execution, are subsequently declared unconstitutional. *E. g.,* Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971) (holding Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), non-retroactive); *see* Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (holding Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) non-retroactive). Of particular relevance to the plurality was the fact that although Mackey's claim was grounded in a violation of the Fifth Amendment, the evidence, like that involved in the retroactive application of a Fourth Amendment exclusionary rule decision, was "concededly relevant and probative," 401 U.S. at 675, 91 S.Ct. at 1164, 28 L.Ed.2d at 410, and that the use of it would be unlikely to undermine the integrity of the fact determination process. *See also, e. g.,* Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (holding Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964) non-retroactive), and Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) (holding Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) non-retroactive).

---

2. One concurring opinion did not reach the question whether *Marchetti* and *Grosso* applied, and the other held they did not apply only because the case was on collateral rather than direct review.

The Eighth Circuit has passed on the question before us in Hanon v. United States, 428 F.2d 101 (8th Cir. 1970) (en banc), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971). That court rejected the characterization of the question as one under the Fifth Amendment and treated it as a Fourth Amendment issue. Recognizing that the search was valid when made, it, like the plurality in *Mackey,* relied on the Supreme Court's reluctance to give exclusionary rule decisions retroactive sweep, since the rule is but a procedural device for implementing the Fourth Amendment, and has no significant impact on the integrity of the fact determination process. *See* Desist v. United States, *supra*; Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *see also* Williams v. United States, *supra.* The result was a refusal to apply *Marchetti* and *Grosso* retroactively in an exclusionary rule context.

■ We agree with the Eighth Circuit. Although the gravamen of Scaglione's claim is a violation of the Fifth Amendment, the ultimate question is whether the exclusionary rule should be invoked. Therefore, reliance on the Supreme Court decisions denying retroactivity to exclusionary rule cases is appropriate.[3] And, as the Supreme Court has made clear, the fact that the underlying claim is a violation of the Fifth, rather than the Fourth Amendment, does not render such reliance inapposite. Mackey v. United States, *su-*

*pra;* Johnson v. New Jersey, *supra;* Tehan v. Shott, *supra.*

Also, like the Eighth Circuit, we conclude that *Marchetti* and *Grosso* should not be given such retroactive application as would bar the introduction in a § 1952 prosecution of evidence obtained in a pre-*Marchetti-Grosso* search based on probable cause to believe a violation of the wagering tax statutes had occurred. The integrity of the fact determination process in the § 1952 prosecution was not impaired by the use of this evidence. Hanon, *supra*, 428 F.2d at 104. Desist, *supra*, 394 U.S. at 250, 89 S.Ct. at 1034, 22 L.Ed.2d at 255; Linkletter, *supra*, 381 U.S. at 638–639, 85 S.Ct. at 1743, 14 L.Ed.2d at 613–614. And, in addition, the search was based on probable cause to believe there existed a violation of a statute which, on two prior occasions, had been upheld by the Supreme Court. United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953); Lewis v. United States, 348 U.S. 419, 75 S. Ct. 415, 99 L.Ed. 475 (1955).[4] Accordingly, the admission of the evidence seized in the April, 1965 search was not improper.

### 3.

■■ There was no error in admission of various evidence which tended circumstantially to prove that the flash paper which appellant ordered was intended to be used as a device in numbers, policy, bolita and other similar games. Flash paper has other uses as

---

3. We think the case sufficiently partakes of a Fourth Amendment question that, for purposes of determining whether *Marchetti* and *Grosso* must be applied retroactively, the relevant date is the date of the search. *E. g.*, Desist v. United States, *supra*; Williams v. United States, *supra.*

However, while we do treat this claim as though it were under the Fourth Amendment, in view of the fact that the asserted underlying violation is of the Fifth Amendment we find it unnecessary to resolve the question whether Scaglione has standing to object to the introduction of the evidence. Even if he does, we conclude that the evidence was admissible.

4. Washington v. United States, *supra*, 402 F.2d at 6, and DiPiazza v. United States, 415 F.2d 99, 106–107 (6th Cir. 1969), cert. denied, 401 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971) have also come to the conclusion we have reached, but on grounds we find unnecessary to consider. However, we note that we hold only that *Marchetti* and *Grosso* do not bar the introduction in collateral prosecutions of evidence obtained as a result of pre-*Marchetti-Grosso* searches based on probable cause to believe that the wagering tax statutes had been violated. We express no opinion on the use of evidence obtained in searches conducted after *Marchetti* and *Grosso.*

well.[5] The government introduced evidence to the effect that gambling was a business with appellant—one of his means of livelihood, that he took wagers at his sundries shop and at his poolroom, that flash paper was seen at the poolroom, that he was present at the situs of a lottery operation when it was raided in an unrelated Internal Revenue case and numerous pieces of gambling paraphernalia found, that he had been convicted in municipal court for conducting a game of chance and playing games of chance, that he was found to have in his pocket a newspaper clipping describing arrest of another person named Scaglione on lottery charges.[6]

### 4.

While deliberating, in mid-afternoon, the jury had a communication with a deputy United States marshal, described by him this way:

> They asked if their decision had to be unanimous, and I instructed them to go by your instructions and that they would have to agree. And then I asked—they tried to ask me about something, and I said, "If you have any questions, write a note and I will take it to the Court."

Defense counsel overheard the remark, reported it to the court in late afternoon, and moved for a mistrial. The court interrogated the deputy marshal, verified what had been said, and denied the motion. At once the trial judge reinstructed the jury on the necessity for a unanimous verdict, and included therein instructions that each juror must decide the case for himself, that the verdict must represent the considered judgment of each, and that no juror was to surrender his honest conviction solely because of the opinion of fellow jurors or for the mere purpose of reaching a verdict. This was done over the objection

of defendant, who insisted that the entire instruction to the jury be given again rather than the jury be reinstructed on the single matter of a unanimous verdict.

The defendant asserts there was error in overruling the motion for mistrial and focuses on the language that "[the jury] would have to agree," construed by him to possibly convey to jurors that they were required to surrender their views and accede to the views of others.

■ The careful reinstruction to remove the possibility of prejudice arising from the marshal's remark was a procedure available to the court in its discretion. We are not able to say that it was clearly erroneous in denying a mistrial. Morgan v. United States, 399 F.2d 93 (5th Cir. 1968).

### 5.

■ We have examined the lengthy closing arguments of counsel, covering almost 100 pages of the transcript, and conclude that there is no reversible error in the prosecution arguments. We make specific reference to only two remarks, the content of which carried the most risk of prejudice. The prosecutor said: "Pick up your newspaper as I am sure you have. Look over in New Orleans right now. They are investigating the corruption of police officials." The court admonished government counsel that he should not remind the jury of matters not in evidence and to "quit talking about what the newspapers say."

Later the prosecutor said this:

> You have an opportunity now to rip away a member of a vicious organization; an organization that lives on this type of business.
>
> Rip him away. Upset—make the rats run from the sinking ship. Be-

---

5. There was testimony concerning use of it by magicians and sale of it to them by suppliers of magicians' equipment.

6. A good argument can be made that the possibility of prejudice from the similarity

of names outweighed the probative value of this single item, but it was only one straw in a sizeable stack. If admitting the clipping was error, it was not reversible.

cause when you rip away one cog from the wheel, it will collapse.

There was no objection. The reference to rats leaving the sinking ship was intemperate, and the government acknowledges that it was, but we cannot say that it was any more than that. There was evidence that Scaglione was operating a lottery in his store, that he was in the gambling business, and that he was part of an organized operation.

Other remarks now said to be reversibly erroneous were either not improper, at all, not objected to, the objection sustained, or a curative statement made by the court.

■■ Just prior to commencment of oral argument the court instructed counsel that he feared remarks of either side might upset the other side, which he wished to avoid, and said: "If you have any objection, either of you, stand up quietly and I will stop the person who is talking and hear you. You understand that." After this fresh admonition of not only the necessity of objecting but the procedure to be followed, defense counsel asserts as error four remarks to which he entered no objection. Also, immediately after arguments and in the absence of the jury defense counsel moved for a mistrial "on the various courses of argument that the Government had," stating that as to some matters he had failed to object while argument was going on "for the purpose of continuity." Where appropriate we can, and do, recognize improper argument as plain error, reversible without the necessity of an objection. This is not such a case, from either the content of what was said or from existence of circumstances tending to excuse counsel from his duty to object. After all, the objection is not merely to preserve a point for appellate review but also to give the court and opposing counsel an opportunity to correct errors at the time while they are still correctible.

Affirmed.